Morlock representing Farm Credit Services of America in this case. This case presents a discreet issue within the bankruptcy courts of the Eighth Circuit, and that is what's the appropriate interest rate that should be applied to the claim of a secured creditor in a Chapter 12 bankruptcy plan. I think you kind of hit the nail on the head with the way you framed it, and maybe I misperceived the way it was presented, but the way it was presented was you have a choice as a starting point between the prime rate and the treasury rate, and that seems to me almost to be a red herring because what you just said, the real issue is what's the ultimate rate that's applied. Does it really matter where you start? Isn't really the answer where you end up? It's absolutely crucial where a bankruptcy court begins its analysis of applying the correct rate on this kind of loan under Chapter 12. Both the Dowd and Till cases, which actually provide the basis for the method that is to be applied, start there, and that's why it's important. In fact, if I may just start out with the standard of review, I think a very good case that also frames the subject very well is Enri Rosso, 8th Circuit, 1996. And here, if I may just quote a short section, we review findings of fact of a bankruptcy court for clear error and its conclusions of law de novo. The determination of the factors that appropriately may be considered when calculating the market rate of interest is an issue of law, while the final determination of the market rate is an issue of fact. The bankruptcy court in Rosso started with an interest rate that was only available to new farmers. It was a subsidized rate. And the thing that the 8th Circuit found was that the market rate that the bankruptcy court erred, when it started with a rate that was below the market rate for those types of loans, and that's exactly the error we believe the bankruptcy court committed here as a matter of law. That is, the bankruptcy court started not with the prime rate, which certainly after all, 2004, and based on all the evidence presented in the record, is the prime national rate at that time, 3.25 percent, since it's gone up quite a bit. Yes, that's true. Walk through this with me a little bit. The treasury rate, I think, was 1.88? Yes. And I don't know, somehow, and then there was a 2 percent risk factor added to that, right? Right. And then it got, somehow it got rounded up to 4? Yes. Okay. So, for purposes of this discussion, let's just say it was 2, was the treasury rate, and then 2 plus for risk. Yes. As I understand it, treasury is sort of a risk-free rate, because the government, we hope, always pays, and there's no risk, right? And that's the point that... Let me finish. I'm sorry, I thought you had... Am I right about that? What's that? That the treasury rate is essentially a risk-free rate. No, I don't agree with that. I don't think the U.S. is... Well, what's the risk that the government goes under? The risk-free rate in this market is the prime national rate. That was... Well, no, come on. That's number two in sales. All right, let's talk about that. Let's talk about the prime rate. The prime rate is what is the rate that is given to lenders, excuse me, borrowers, with generally good credit, right? Yes. There's always some risk that even someone with good credit will default. There's very little risk that the government defaults, right? Right. So essentially, the treasury rate is a risk-free rate, and the prime rate includes some measure of risk for generally good borrowers. Yes, in the marketplace. Now what applied here was a 2 for the treasury and 2 more for risk, and the prime rate is resulted in 4. What's the difference between that and starting at prime, 3.25, let me finish, and saying, well, there's a little bit of risk here. Let's add three-quarters of a point and make it 4, but there's really not a lot of risk because this is way over-securitized. That brings me back to where I was at the beginning. Isn't this whole underlying thing kind of a red herring? Because the difference in risk is the difference between an investment and a lender borrowing, and a lender providing a loan. The riskless rate is the lowest rate, and it's not a rule. The prime rate is a standard. It's in the marketplace that lenders use that's set by every bank, but it's essentially the same so that across the market there's some way to anticipate what loans will be. The riskless rate is the prime rate because the riskless rate is the rate at which a lender can afford to lend money. In this case, farm credit couldn't even borrow money at 1.88%. Let's say the court used the prime rate, 3.25, and said I think a risk factor of .75 is appropriate here because the loan is very over-secured. Would we be here? I'm not sure if we would. In bankruptcy, one of my favorite parts of it is that the parties really work hard to avoid being in places like this. The fact of the matter is we probably would have had something to say at a hearing about just this .75% increase. The fact of the matter is the two-point increase is not a matter on appeal. It's not an issue before the court at this time, and that's why we believe 5.25% isn't an appropriate rate. The point I was trying to make is it seems to me the question is the way you framed it in the very beginning, is the overall rate a reasonable rate to use? I don't know. It just seems to me to be a red herring where you start. It's where you end up. That's where I go back to Rosso, which said it's absolutely important that you get the base rate right first, and that has to be the riskless rate in the market. If you don't do that, if you start with a rate that's below the market rate, that's an error as a matter of law. That's just the jurisprudence of the Eighth Circuit. I think that's also the jurisprudence until, which wanted to establish some baseline that courts could use because there's a Tenth Circuit case that slips into mind at the moment that I think the quote is courts, judges, and frankly lawyers are not lenders and bankers, that courts need a place to go that's certain, that's plain, that's understandable to everybody to develop an interest rate in Chapter 12. You focus a lot on Rosso, but that just talked about a market rate, and the subsidized rate was not a market rate. So here we're back to either the Treasury bond rate or the prime rate. We're not talking about something that's dramatically above or below. So I'm not sure that Rosso helps you as much as you'd like it to because I think there that wasn't really even using the formula rate in the proper fashion. But a court still has to come up with the appropriate market rate, and ever since Till was established, or I'm sorry, established, entered, the ruling was entered, every bankruptcy court except in this decision has applied the Till prime rate method. But if I understand your briefing is that Till did not require this, or maybe that is your point. Is your point that from Till on out, any base rate simply has to be the prime rate and it could never be the Treasury bond rate? No, because obviously the life in our country and the economy has changed, certainly from 1989 when Dowd was written, and the court there was trying to address interest rates going up and down in which a party could come in with 10% and then all of a sudden a plan is at 20 or vice versa, and so the court there relying on a, ironically, Chapter 13 case, Fishers, adopted what it thought was a stable interest rate that it could build from that wasn't the contract rate, it wasn't coerced, the court wasn't underwriting a brand new loan, and so it used its best efforts to come up with a rate there, and so it was not clearly erroneous. Times have changed, and it could be that in another 5, 10 years our economy takes a dip and a turn in which the rates don't make sense anymore, but they make sense now. And again, it was the evidence, excuse me, Your Honor, it was the evidence in the case. So is that a question of law or a question of fact then? What I heard you, and I'm sorry I was almost interrupting you, but I just heard this argument about facts change, the circumstances change, and what the appropriate market rate would be, and I thought you were saying at the beginning of your argument that this was a question of law. When the market rate found by the court is below the market rate that's used by everybody in that market, then that is an error as a matter of law. 1.88% is drastically below the market rate. That's what the evidence in this case showed, and it's the reason that bankruptcy courts since Till in the 8th Circuit have had no problem adopting the prime rate as the starting place and then building on .75 or 1 or 2 on top of that. They see Dowd and Till as perfectly consistent. And that's why we would ask that the court return this issue to the bankruptcy court and order a prime rate be used as a base rate. What ultimate rate do you want? 5.25%. Which is 3.25 plus 2? 3.25 plus 2, because 2 was the risk factors the court had already applied, and it's not an issue on appeal. But the court started at a risk-free rate, the Treasury rate. I would disagree. It's a risk-free rate for investors, not for lenders, because this is the market. I understand that, but you don't lend at 1.88. No. Of course not. Right. So, but that rate reflects a risk-free environment. The government is going to pay. A prime rate represents risk. Less risky, but, you know, the better borrowers, but it still reflects risk. But there's nobody in this market that's going to... Why would the court be stuck with a 2% adjustment? Because it had already decided that that was... I'm not sure the court... It decided it based on the risk. I can't speak for the court, but I'm not sure the court started at 4 and said, well, I'm going to get to 4, and so I'm going to add 2 on. I think 2 was an independent calculation about, you know, people being in bankruptcy, you know, under endowed. Let me ask one other question. But I perform credit. Do you think Till mandates use of prime, given that, as I understand it, Till was just a plurality opinion? It certainly was. The dissent wanted to go, wanted to be a little sterner on debtors and wanted to use contract rates and even default rates, but the plurality decided that the prime national rate was the best way to go forward, and in the opinion... But the vote that made it a majority was Justice Thomas, right? Yes, I believe so. And he didn't adopt prime. So I'm not sure that Till necessarily compels all courts thereafter to use prime. But certainly, and this is where Till and Dowd really come down, is that you do want to start with the riskless market rate that lenders use across the board for their best customers. And that was 3.25. And for that reason, we asked the court for the relief requested. Thank you. Thank you. I think I have one minute of reply, but we'll see if we need it. Thank you. Very well. Mr. Martin, good morning. Good morning, Your Honor. May it please the court. My name is Ronald Martin, Ron Martin. I represent the debtor, the appellee, Mr. Howard, William Howard Topp. Mr. Topp is a farmer in the Southern District of Iowa. Your Honors, I had laid out a fairly extensive argument here to follow. I'm not sure I need to. I would like to clear up a couple misconceptions that my colleague has. First of all, what the bankruptcy code requires is that a secured debtor, a secured creditor, a secured creditor receives the present value of its claim under the bankruptcy code. Both this court in doubt and the Till Court says, we're not interested in a profit margin. We're not interested in the cost of funds. What we are interested in is the present value. And Your Honor, that's where the no risk rate comes. It has nothing to do with what that creditor can get in the market. This concept of the prime rate is indeed a red herring. Go down to the bank and ask them what their prime rate is. I've done it before. You're not going to get an answer. What you're going to get is what they'll loan you money for. But Your Honor, that's not what the bankruptcy code asks for. That's not what it says and that's certainly not what Till says. What I believe and what my position has been in my 20 years of practice in the bankruptcy field representing farmers in Chapter 12 and creditors in Chapter 11 and a few individuals in 7 is quite frankly, doubt is the law of the 8th circuit. The bankruptcy court, the district court, and even my opponent has recognized doubt was not abrogated by Till. There is no reason to abandon this court's position in doubt. And in fact, Your Honor, I understand that it's a very dangerous thing to go in front of a court and tell the court what it can and cannot do and I'm certainly not going to do that today. But I am going to direct the court's attention to what it describes as its cardinal rule. And its cardinal rule is that one panel will not overturn the finding or the holding of another panel absent an intervening Supreme Court case. And Your Honor, Till is not an intervening support case. As Judge Grudner pointed out, it is a plurality decision. It is a fragmented court. And Justice Thomas specifically referred to a riskless rate. And Your Honor, the idea behind the riskless rate is that the debtor or the creditor would prefer to have the property. If you give the creditor back the property, what can they do with the money? Well, Your Honor, if they allow the debtor to continue to use that property, then it's only fair to provide them with a base rate and then a risk enhancement. As Justice Thomas said, there is nothing in the code itself which requires that risk enhancement. What I do in my practice, Your Honors, is I file the bankruptcy case and I line up all of my secured creditors. And then I start calling them. What Dow gives me is a way to negotiate. Because I say the law of the Eighth Circuit is that we start with that treasury bond rate of a period of time which matches what we're going to restructure your loan in. And Your Honors, the bankruptcy code under 1222, I believe, gives the debtor the opportunity and the ability to modify those loans that the secured creditor. 1225 requires that they retain the loan and they receive present value. What we are determining is not the cost of funds, which my opponent argued. We are not talking about a presumptive contract rate or a coerced loan. What we are talking about is the present value paid over time. And Your Honor? I know it's become the custom, but is there anything in the code that says that the court in determining the discount rate, that the court should start with a base rate of any sort whatsoever and then add a risk adjustment? Is there anything in the code that suggests that that's the way to do that? No, Your Honor. As this court in 1989 determined in following the bankruptcy court said, the bankruptcy code does not define present value. We leave it to the judgment of the court. And so that's one of the issues, Your Honor. My colleague has correctly stated the standard of review. This court will determine facts under an erroneous standard and questions of law de novo. Yeah, but I guess the question is, which base rate, if we have to use a base rate, which one, is that a fact question or a legal question? Your Honor, regardless of whether or not it is one or the other, it is an issue of established stare decisis in the Eighth Circuit, which is you use the T-bill. I can put together a mortgage utilizing that T-bill and then I can negotiate the risk enhancement. And then at that point, if my secure creditor doesn't want to talk to me about the risk enhancement, I can say, okay, you see what Dow says. You see what your burden is. You are going to have to prove the risk enhancement. And Your Honor, there is no evidence in the trial record pertaining to risk. In fact, when we asked Mr. Ellenson, and I've dealt with Mr. Ellenson before. He's not a bad person. But when we asked him, what is your risk of nonpayment? Ultimately, he said, there's a high probability that we'd get paid regardless of whether this proceeds through Chapter 12 or if we go ahead and this fails and we have to foreclose. And the reason that he said, he said, outside of bankruptcy, during the height of the farm crisis, the companies that he worked for saw as much as a 37% decrease in the value of their collateral. Well, we did the math, Your Honor. 1.4 million times a 40% decrease, they're still oversecured by $200,000. They're going to get paid. All of the factors which were in doubt, and remember, in doubt, the secure creditor was underwater. That claim was bifurcated and it was stripped down to the secured amount and to the unsecured amount. At that point, the court was concerned about all of the different things that the secure creditor would have to go through, including mandatory mediation. Your Honor, I can deal with mandatory mediation in a bankruptcy case. All I've got to do is negotiate that with the creditor. The creditor can say, hey, if your guy does not, or your client, guy or girl, because there's plenty of women farmers out there, if they do not go ahead and perform on their plan, what do we do? I'm concerned about, number one, you fight me on relief from stay, okay, we'll put a drop dead in there that says if we have a period of time in which my client is in default, give us a little time and we will go ahead. And if we can't right the ship, we're not going to hold you hostage, we will consent to a motion to relief from stay. Okay, well, what about mandatory mediation? Well, if we are at that point and we know there's no hope, we can consent to waive mandatory mediation. All of these things are able to be negotiated and to be put in a Chapter 12 plan. In this case, the sticking point was ultimately the amount of the interest rate that provides present value for the creditor's claim. At the bankruptcy court, had the court proposed the prime rate, what would your position have been? Well, Your Honor, to be quite frank, when I went into the court at the discussion level, my colleague pointed out that the court had mentioned the prime rate at that point. Given the opportunity to argue it, I would have said, Your Honor, doubt is the law of the Eighth Circuit. Your colleague, Judge Jackwig, drafted that decision in 1987. There has been no argument today and there's been no evidence. Let's assume that, to follow up on that question, that the court said, you're wrong, I think Till supersedes and you're wrong. Would your position on the risk adjustment part of it have changed? I'm not sure I understand quite what you're saying. My understanding, and I think what Mr. Moorlach is arguing, is they started with a 2% treasury rate, added a 2% risk. He wants to treat the 2% risk as if we were to agree with him that the court is stuck with that. It would have to be prime, three and a quarter, plus two, five and a quarter. If the court had started at prime, three and a quarter, would you have said, yeah, two as the risk adjustment is appropriate, or would you have argued for a different risk adjustment? No, Your Honor, I would have pointed out that there is no risk because they were so far oversecured. There is no risk that they were not yet paid in plain. Let me argue to you. Would you have accepted the 2% that Mr. Moorlach seems to think the court is stuck with? If it started at 3.5 and then went at 5.2, Your Honor, we would have appealed. We would have appealed based on doubt. You would have appealed? Yes, Your Honor, because doubt is important, Your Honor. Well, let's assume that no court will agree with you on that. Would you have accepted, if they started at prime, would you have said a 2% risk adjustment is reasonable? No, Your Honor, my position would have been there is no risk because you're so dramatically oversecured, and we pointed out case law that supported that position. In fact, Judge Chaudine, in her decision, pointed out there is no evidence of risk. There's no data, and then she went ahead and she added a 2% risk factor. So, Your Honor, I see that my time is about up, which is probably good. I probably talked plenty. Let me just make a couple of points. I think what the court can do today, and you've got a few options. One, you go ahead and you rely on your cardinal rule. You say doubt is good law. Till did not change that, and you summarily write a decision. The second thing you can do is you can go ahead and you can decide to go ahead and flesh out the court's position on doubt, and I would ask you to go ahead and reaffirm doubt. I would ask you to go ahead and use the true riskless rate, which is a treasury bond rate, and I'd ask you to put in something that says, if your creditor is greatly over-secured, perhaps you better put on some good evidence of why that doesn't matter, because in fact, Your Honor, you've noticed that interest rates have gone up, so have land values right now. We believe that the land securing the creditor's claim is over $2 million. The third option, Your Honor, if you take the position that somehow the appellant has put on an argument which will allow you to go ahead and write a decision saying, you know, I think this plurality decision until in a Chapter 13 case is applicable to Chapter 11 and Chapter 12 cases, the only thing I'd ask you then is to do a full analysis and find that in fact the bankruptcy court held that there was no risk and direct the lower court to go at a straight 3.25 interest rate. Your Honor, I see my time is almost up. Is there any other questions that you may have for me? Hearing none, thank you, Mr. Martin. Thank you, Your Honor. Your Honors, I wanted to get back to one point we were discussing, that is the difference between the treasury and the prime rate. The prime rate also takes into account inflation in a way that the treasury rates do not. It's actually tied to the federal fund's target rate that we hear about, and it's usually set by, and it is, you can walk into a bank, you can go on Google and look up U.S. Bank or Bank of America or Wells Fargo. Their prime rate is right there, and it's 3.25. Also Dowd, interestingly in my view, paid attention to what other bankruptcy courts were doing at the time in trying to figure out an appropriate interest rate. I think the court here can also do that. Again, all bankruptcy courts in the 8th Circuit that have addressed this issue have fallen in line with Till and started with the prime rate and with that. Let me ask this one more time, see if we can get a clear answer. Had the court started at prime, 3.25, and said, I find there's very little risk because it's way oversecured, I'm going to add 0.75 and the discount rate is 4, would you have appealed? Would my client have appealed? That's a very difficult question. That's fair enough. Would your client have appealed? I just, I am not sure. I can't stand here and say they wouldn't or they wouldn't have. I think that my client definitely would have been very pleased, if I can say this, that the bankruptcy court did start with the market rate of prime and would have taken that fully into account before deciding whether to expend the resources on deciding for, to argue for another point as a risk factor. But if that helps, thank you. We appreciate all counsel's appearance here this morning. Interesting issue and we'll issue an opinion in due course. Thank you.